#### DAVID CORLIES v. WILLIAM LITTLE.

A verdict founded evidently in a mistake, or against the weight of evidence, will be set aside.

Where a testator directs, or authorizes his executors to sell his real estate, and one of the executors refuses or neglects to act, the other, in the life time of his co-executor, can make a good conveyance.

---

This was an action of trespass tried at the Monmouth Circuit, at the October term, 1831, before Justice Drake. A verdict was rendered for the plaintiff. On the return of the postea the defendant obtained a rule to shew cause, why the verdict should not be set aside, and a new trial had. On the argument of the rule, the evidence offered during the trial of the cause at the Circuit, was received, but its insertion here is not necessary, as the material parts of it are noticed in the opinion of the court.

*Randolph*, for the plaintiff.

*Wall* and *J. S. Green*, for defendant.

FORD J.  This action of trespass is brought against the defendant, for having ordered Benjamin Marks to cut three or four cords of wood on a piece of ground alleged by the plaintiff to be in his possession, and to lie within the bounds of a patent granted to one Stephen West, in 1690, for 312 acres, under which the plaintiff claims title. The defendant claims title to it under one David Nott, dec. who claimed under a younger survey that bounded on this patent line, and the line of West's patent is the matter in dispute between them. This patent was granted in the form of a parallelogram, 64 chains long, and 54 chains wide, having its opposite sides parallel and equal, and stated the beginning corner to be " *a large white oak tree, marked on four sides, standing on the north side of a*

*run, that goes into the north branch of Manasquan, on the east side thereof; thence* 54 *chains to a black oak.*" This black oak is identified and admitted by the parties to be a monument that fixes this corner. By reversing the course from it, and measuring 54 chains backward, the white oak ought to be found which is described as the place of beginning, but none such is there found. It was a large white oak that had its growth in 1690, now a century and a half ago, and has, as the defendant alleges, died the death of nature, hastened perhaps by the destructive fires so often occurring in the woods. In every other respect, the spot answers to the description given in the patent; it is in the true course from the black oak; it is at the true distance of 54 chains; it is on the *north side* of a run, small indeed, but that is immaterial, the size not being stated in the patent, and dry *at times,* as might have been its character at the date of the survey, which says nothing to the contrary, or may have arisen from clearing the land; it goes into the north branch of Manasquan on the east side thereof, at the distance of about seven chains, the last four chains of which the Pree and it mingle their waters together; and thus the features correspond with those in the patent, in every minute particular, except that the tree has disappeared, and here the defendant alleges is the corner. If it be so, Benjamin Marks did not cut upon the survey of West.

But let us consider the evidence of this corner being in a different place contended for on the part of the plaintiff. There certainly is a large white oak tree, marked on four sides, now standing on the north side of a run respectable for its size, never dry, that goes directly into the north branch of Manasquan, on the east side thereof; it also stands in the true course from the black oak tree, and thus it corresponds in every minute particular with that described in the patent, save only that it is distant from the black oak 70 chains, instead of 54. But in these very early surveys, having fixed monuments, the chain most commonly falls short of reaching the mark; and the largeness of the measure was not a fraud, but a known allowance for encouragement to settlers; the land was sold by marks or monuments; and therefore the chain, which is at best rather uncertain, must always yield homage to marks and monuments

that are truly original and genuine. But wherever these can-
not be shewn, the chain remains the only rule to which the law
can resort by the terms of the survey. Is this white oak refer-
red to by all the witnesses as being marked on four sides, stand-
ing at the end of 70 chains, the monument mentioned in the
patent ? It certainly is not. The tree mentioned in the patent
was marked in 1690, on its four sides ; whereas this is proved
by all the witnesses only 30 years ago, to have had no survey-
or's mark upon it ; they shew the man, Mr. D'Camp, who
then put on these marks, and also the occasion of his doing it ;
he was one of the three town surveyors called out to mark a
line for a temporary fence, until the true corner, which was at
that very time in contention, could be legally settled, and they
marked this for one end of the *fence;* it has no originality, no
antiquity; it is one hundred years later than the date of the
patent, and may not be foisted in as the original tree. The
surveyors were not empowered to settle corners ; and yet, by
marking this tree on its four sides like the patent tree, a repu-
tation has arisen from thence, that this is the original tree, when
it is nothing more than the mark they made for a fence. The
ancient monument is unquestionably gone, and nothing is left
to govern the survey but the length of the chain to which the
law can resort, and this is corroborated by reputation both an-
cient and strong. This patent had its lines traced nearly forty
years ago, by Dennis, a surveyor, accompanied by Mr. Throg-
morton, Mr. Nott, John Hurley and others, who sent for one
Remembrance Lippincott, living about a quarter of a mile from
the place, and the oldest man then in the neighborhood, to shew
where the old white oak tree mentioned in the patent had stood ;
he said it had decayed and was dead, but it had stood at the end
of 54 chains from the black oak, and was a white oak tree
marked on four sides. John M. Lippincott, a grand son of
Remembrance Lippincott, was shewn a stone by his immediate
father, as the place where the corner tree stood, which stone
was only 54 chains distant from the black oak. Garret Mor-
ford, also an aged man, declared that he knew a white oak tree
had stood at the end of 54 chains from the black oak, as he in
his life time informed Joseph Stout. Here, then, the evidence
borne by the chain, is corroborated by reputation derived from

ancient men, who remembered the tree.　The jury has rejected the chain with all its corroborations, in favor of what they supposed to be a monument mentioned in the patent, whereas it appears to be only a mark made for putting up a fence, at least one hundred years after the patent bears date.　It is no more a mark sanctioned by the patent, than if it had been made but yesterday, and as the plaintiff's documentary title to the *disputed land* entirely failed, the verdict must necessarily be set aside, unless an adverse possession for twenty years of the disputed place was sufficiently shewn by the plaintiff to answer in lieu of title.　But his evidence in support of this allegation proves only a mixed, not an adverse and exclusive possession. The township surveyors having to indicate a line for a fence, allowed the eastern side of the parallelogram to be 70 chains in length, in order to reach the white oak tree which they marked, while they allowed the western side, which is parallel to the eastern, to be only the patent length of 54 chains ; the line connecting these two corners was ordered to be the line for fencing, but instead of being parallel to its own opposite side, it is a diagonal, called by the witnesses a catercornered line. The fence erected on this line seems to have been respected by Robert Lippincott on the one side, and by David Nott on the opposite side.　Robert Lippincott pointed out this as his line, to Ayers, a chopper under him, and directed him not to chop over it, for that David Nott, his neighbor on the opposite side, was a cross man.　And although David Nott cleared up a field almost adjoining this line, and rented it out both to Samuel Wright, and afterwards to one Lewis Ayers ; the evidence that Nott had any possession over this line is not very satisfactory. So far as this diagonal fence does extend, the plaintiff shews an exclusive possession that might amount to a title ; but the ground where the wood in question was cut by Marks, lies the other side of the diagonal line, and the point is, whether Lippincott or Corlies, who claims under him, have shewn a possession twenty years the other side of this fence, that was really adverse, exclusive, definite and peaceable.　It is clear that the evidence falls short of this.　They have cut wood for fuel, on the opposite side, both here and there all about the woods, but not by any definite line or boundary to limit such cutting ;

and those under Nott have done as much or more on their side of the fence ; and therefore, mere possession by itself, without deed, is destitute of several features that are indispensably necessary to constitute a title in this present case. The jury have rejected the chain, in favor of what they supposed to be a monument 140 years old, which is no monument of the original patent, but appears to have been made by a private person, having no legal authority, so recently as within 34 years ; and the verdict being founded evidently in a mistake, I am of opinion it ought to be set aside. The plaintiff suggests that there cannot be a new trial, as the defendant has recently died. The verdict being set aside, the parties can be heard on the subject of granting a new trial if they wish to be heard about it.

RYERSON, J. This was an action brought to recover damages for a trespass in cutting wood on what the plaintiff alleged was his land. Under the plea of *not guilty*, the defendant contested both the plaintiff's title and possession. A verdict was rendered for the plaintiff, which the court are asked to set aside and grant a new trial, for supposed errors, or mistakes, both of the judge and jury before whom the cause was tried.

The facts in evidence show at least a mixed possession of the *locus in quo*. The plaintiff also attempted to show a chain of documentary title from the East-Jersey proprietors down to himself. One link of this title, being objected to by the defendant's counsel, was withdrawn. Of this I shall have occasion again to speak. It was attempted to be shown on the argument, that the plaintiff's title was not regular and complete in other respects. I am, however, inclined to think the documentary title sufficient to sustain this action for an injury to the land actually embraced within it, and not held by an *exclusive adverse* possession. The defendant also exhibited a paper title. But as that of the plaintiff was older in its emanation from the general proprietors, the question ought properly to turn on the true boundary or extent of the land embraced in the plaintiff's deed. Without the aid of deeds to limit and ascertain the extent of their possession, either party would have found it difficult, perhaps, to maintain an action similar to this ; the land not being enclosed, and other evidences of possession equivocal or contradictory. The plaintiff claimed under a patent of four sides, being

Corlies *v.* Little.

a rectangular parallelogram, the respective sides of which were fifty-four and sixty-four chains, and containing three hundred and twelve acres, besides allowances for barrens, &c. The first, second and third corners are described as marked trees. The fourth calls for no monument whatever. Nor can I discover from the evidence that any ever existed, or was ever even pretended to exist. The location of the third tree seems to have been known and given rise to no dispute. The second, a black oak, is still better known, and admitted by all parties concerned. But the true location of the first or beginning corner, (being described in the original patent as a great white oak) is involved in great uncertainty. By starting from either of the known corners, and running by the courses and distances called for in the patent, the plaintiff could not reach the land in question. And if we start from the white oak, as located by the plaintiff, and proceed thence to the second and third corner, and thence by the course and distance of the patent to the fourth corner, (where no monument is called for, or was ever seen) and thence by a right line to the beginning set up by the plaintiff, the land in dispute would still be left on the defendant's side of the line, according to the testimony of one of the surveyors, who, in this respect, is not contradicted. Hence the plaintiff must contend successfully, not only that the true location of the white oak beginning was not at the distance of fifty-four chains, but seventy or more from the black oak ; but also that the third line must be protracted to equal extent. Can this last be done, there being no monument to justify it, is one of the questions involved in this cause? Upon this I shall give no further opinion than simply to remark, that the case of *Massey and Watts*, 6th *Cranch*, 166, cited by plaintiff's counsel, can afford no guide ; the decision resting on an artificial rule, growing out of local circumstances, which never had any existence here. But to return to the great question in this cause, where stood the white oak beginning ? None appears at the end of fifty-four chains from the black oak. The plaintiff shows one at the distance of seventy chains. But this is manifestly not the tree, as it was first marked only about thirty-four years ago, instead of one hundred and forty-four, as it should have been ; and the time and occasion of marking it, are distinctly shown. Another has

Corlies *v.* Little.

been shown at the distance of seventy-one or seventy-five chains. This has been called, by some of the witnesses, the boxed tree. But what was the result of that boxing is not shown. Nor does any person say, distinctly, that it was known as the corner. Various reputations in the neighborhood are shown, some locating the white oak at the end of fifty-four chains from the black oak ; some at a point seventeen or twenty-one further north east or indefinitely, to the north of the run shown by the plaintiff. The discrepance of the witnesses is such that I am not able to say in whose favor their testimony preponderates. In this dilemma, I have sought for light among the *documents* submitted to the court. First of all is the West patent, which describes the beginning as standing " on the north side of a run that goes into the north branch of Manasquan, on the east side thereof." Two distinct runs are shown to us, alike answering these requisites, and corresponding with the pretensions of the plaintiff and defendant respectively. With the exception that the defendant's run goes not directly into the said north branch, but first into the run shown by plaintiff, and again the one shown by plaintiff would seem, from the name given it, and its appearance on the map, to be almost too important to answer to the name of *run*. We are therefore about as much in the dark as before. Again we are referred, by the plaintiff's counsel, to the deed of the executors of Nathaniel Robbins to Obadiah Robbins, running twenty chains on this line of the West patent, and the deed of Sheriff Lloyd, to William Lippincott, which it is said runs from Robbins' corner along Bruer's, (that is the West) line and course, 40 30–100 chains, thus going 6 30–100 chains beyond the defendant's location of the white oak. But this language does not necessarily, or perhaps fairly, mean any thing more than that the lines and courses were the same at the commencement of this, without saying that this line terminated in the West or Bruer line. Besides, this deed of Lloyd was not made till 1816 ; long after this dispute arose, and after the extent of the West or Bruer line was settled, by a compromise, or compact, (by arbitration as it was said) extending one line of the parallelogram to seventy chains, and confining the other and opposite side to the strict measure of fifty-four chains. Nor is it shown that Lloyd's deed adopts the description of any deed existing before this

compromise. It can therefore form no test of the true location
of the ancient corner. Again we are referred, by plaintiff's
counsel, to a return in 1753, to Peter Knott, to show that the
opposite line of the parallelogram must have been at least six-
ty-two chains long. But there is nothing in this return to show
that the surveyor meant to stop at the end of this line, except
coincidence of the next course. Nor does such coincidence re-
ally exist. S. 45 E. in 1753 and 1690, would differ from one
another, in the actual surveying, about three degrees, from the
variation of the compass or magnetic needle; and in no wise
can the lines coincide, the Knott survey stopping too soon for
the plaintiff's present insistment and not soon enough according
to the defendant's. The next document to which I refer, is a
deed from Samuel Dennis, to Preserve Potter, dated in 1728,
which, in locating another tract of land, begins at a white oak
standing fifty-four chains north east of the above black oak, and
" four chains south of a brook that runs through Stephen West's
land." If this white oak is the same as mentioned in the West
patent, a circumstance is added, ("standing four chains *south* of
the brook that runs through Stephen West's land," the run con-
tended for by plaintiff) which shows that the brook shown by
plaintiff is not the true *run* mentioned in the West patent; and
it also fixes this white oak as being precisely 54 chains from the
well known black oak, West's 2d corner. For although we some-
times allow excess of measure in a survey, we never do in refe-
rence to find a beginning. If this white oak is not the same,
as the beginning of the West patent, but stands seventeen or
twenty-one chains nearer the black oak, as the plaintiff contends,
the two surveys manifestly interfere ; which can hardly be sup-
posed, as the last not only refers to the second course of the
first, but calls for that very line with which it must interfere.
Or to get back to his beginning, the surveyor must run, not by
West's line, as he professes, but by two of his lines, and his
closing line, of seventeen or twenty-one chains, will exactly coin-
cide with his first, or so nearly so, that the land between them will
not be worth including. It would seem, then, that the surveyor
meant to begin at West's beginning, and describes it by refer-
ence not only to the brook, but to the well known black oak;
and adds to the latter its situation with reference to the north

Corlies *v.* Little.

branch of Manasquan, or the Mingemaholi, so as to give more certainty to the beginning. The description in this deed if followed by the subsequent one of Preserve Potter to Peter Knott, in 1742-3, and the still later one of Joseph Knott, to David and Levey Knott. The last given course in these deeds is " south twenty-one degrees *to* the west, *to* said Stephen West's line." But in the last named deed the omission of the particle *to*, the last time it occurs, has led the plaintiff's counsel apparently into an error, or at least to use an argument not warranted when the word stands in its proper place.

To support the claim of the plaintiff, we must give a large excess of measure in the first line of the West patent. There is nothing extraordinary in this. But I had supposed, until lately, on a view of Leonard Walling's testimony, that where it existed in one line, something like a corresponding excess would be found in the others. I do not perceive, from this case, that any exists in the second and fourth lines ; but according to the plaintiff's claim, the parallelogram must be reversed, and the shorter sides become the longer. But what does occur to me as most remarkable is, that after the improvement of this tract of land, after its sale in undivided moieties, after a partition, in fact, into unequal parts as regards quantity, but equal in regard to value, and successive conveyances in 1760 and 1793, and some subsequent, no notice should be taken of this excess of measure ; and in this point of view, the deed from Jackson, executor of Lippincott, to Brittin Corlies, forty-one years ago, is very important evidence. That deed gives a new *course* for the lines, as south thirty-seven west, instead of south forty-five west, and north fifty degrees and nine minutes west, instead of north forty-five west ; and so of the other courses. This must have been the result of actual surveying by known boundaries, otherwise these courses could not have been established. They differ from the ordinary allowance for variation, and differ in this allowance from each other; being on one line 5.09 degrees, and on the other eight degrees; whereas the variation should have been the same on all the lines, (about five degrees) had it been the result of calculation, and not of actual survey ; and it is shown by the evidence that an actual survey was then made. Now it is inconceivable to my mind that they should

Corlies *v.* Little.

thus correct the *course* from actual survey, and not the distance also ; especially as the deed expressly calls for the original patent lines on the side now in dispute, and the one opposite to it.

These facts, the Preserve Potter deed, and the deeds dependent thereon, and the deed of Jackson, with their respective descriptions and connected facts, together with a verdict of a former jury given in evidence on this trial, it seems to my mind, ought to have given a preponderance to the defendant's evidence, and determined the issue in his favor. Under this view of the case, I am inclined to think the jury must have been misled by what was said of the corner established by the township committee, or by the three practical surveyors acting as arbitrators between some of the parties interested in this line. Neither should have influenced their verdict. The committee had no power to decide the question ; and if the arbitrators had, they ran an oblique line, which did not include the cutting in question. If the plaintiff assumed that line as true, to establish one corner, he ought to have been concluded by it as to the other corner. Besides, if the beginning could not be ascertained with reasonable certainty, the length of chain ought to have had more influence in the division than, it would seem, could have been allowed to it. Upon the whole matter, I think the verdict of the jury so much against the weight of evidence, as to justify the setting it aside, and granting a new trial, on the usual terms of the payment of costs.

I have above alluded to a deed offered in evidence by the plaintiff, objected to by the defendant, and withdrawn. This was the deed from Samuel Lippincott to Joseph Lippincott. It was afterwards, by the defendant, again offered in evidence, objected to by the plaintiff, and rejected by the court. I have not been able to discover any sufficient reason for this decision. It may happen that evidence may be incompetent, or unlawful, for one party, or one purpose, and yet competent and lawful for the other party, or for another purpose. But I do not intend this as a definite opinion on the point.

N.B. This opinion was drawn without adverting to the fact of the death of one of the parties since the trial. The verdict being set aside, the question will be open, whether a new trial can be granted in this case. What was above said was not intended to affect it.

HORNBLOWER, C. J.   I concur in the opinions which have been delivered; the verdict must be set aside.   There is, however, a point of law, presented by the case, and which was argued at the bar, that may as well be put at rest, in case of a new trial, or further litigation between the parties.

On the trial of the cause, the plaintiff offered in evidence a deed, made only by one of the executors of Lippincott, while his co-executor was living.  The admission of the deed was objected to, and the objection overruled by the judge.   Robert Lippincott, by his will, bearing date the 3d October, 1791, empowered and directed his executors to sell his real estate.  He does not devise the land to them to be sold, but gives them a naked power to sell, not coupled with any interest or trust.    Benjamin Jackson, one of the executors, proved the will.    Williams, the other executor, has refused, or neglected, to do so.    The deed, given in evidence, was made by Benjamin Jackson, and bears date the 6th of May, 1793.   Does that deed convey any estate or title?  In this case, it is not material, whether the power given to the executors was a naked power, or one coupled with an interest; or whether it was a devise to them to sell, to execute any trusts in regard to the proceeds; because here is no question of survivorship.  Both executors were living when the deed was made.   The simple question is, whether if a testator directs, or authorizes, his executors to sell his real estate; and one executor refuses or neglects to act, the other, in the life time of his co-executor, can make a good conveyance.

The rule at the common law seems to be clear, that in case of a naked power to executors to sell, and one of them dies, the power will not survive.   *Co. Litt.* 112, *b.* 113, *a.* 181, *b.*  *Shep. Touchstone, title Testament, pl.* 9, *p.* 429, 448; *Osgood* v. *Franklin,* 2 *Johns. C. R.* 19, *and seq. and the same case in error,* 14 *Johns. R. per Platt Just,* 553, *and seq.*

It is equally clear that at the common law, if one or more executors refused to sell, the other or others could not; *Co. Litt.* 113, *a.* 2 *Shep. Touchstone, Ch.* 23, *p.* 448, *first Amer. Edit.*    So the law stood when Littleton wrote; " but now," (Coke says) " by the statute of 21. H. 8. it is provided, that where lands are willed to be sold by executors, that though part of them refuse, yet the residue may sell; and, albeit, the letter of the law ex-

tendeth only where executors have a power to sell, yet being a beneficial law, it is, by construction, extended to where lands are devised to executors to be sold." In a note to page 449 of the *first American edition of Shep. Touchstone, Ch.* 23, it is said, " that excellent statute," (21, H. 8.) " enacts, that where part of the executors named in any will, whereby lands are directed to be sold by the executors thereof, do refuse to take the administration and charge of the will, and the rest of the executors do accept and take upon them the charge of the will, all bargains and sales of such lands, so directed to be sold, made by the executors accepting, shall be as effectual as if the executors, so refusing, had joined."

In the case of *Zeback* v. *Smith,* 3 *Bin. R.* 69, the testator appointed A. B. & C. his executors, and gave them power to sell his lands as follows : " The executors, namely, A. B. & C. shall be empowered to sell my land, &c." Two of the executors renounced in December, 1775, and in May, 1781, the other executor sold the land. The Supreme Court of Pennsylvania held the sale to be valid ; it seemed to be considered as an admitted position, that if authority to sell is given to executors, *virtute officii,* a *surviving* executor may sell, and the court say, " that an acting executor is put in the same state as a surviving executor, by 21 H. 8. Ch. 4." Our statute, which was passed the 16th November, 1795, (*Rev. Laws,* 226, *sec.* 9.) extends, in terms, as well to cases where lands are devised to executors to be sold, as to cases in which the executors are only ordered, or directed, to sell ; and was evidently intended to be retrospective, as well as prospective, though its language is somewhat confused and inaccurate. It begins by enacting, " that where any lands *have been,* or *shall be,* given or devised, &c. or *have been,* or *shall be,* ordered, &c." It then proceeds, *only prospectively,* viz. " and after the death of such testator, part of such executors *refuse,* or *neglect* to take upon him, or them, &c. and the residue of such executors *do* take upon him, or them, the execution, &c. then " (retrospectively, as well as prospectively, again) " all bargains and sales &c. as well *heretofore* made, as *hereafter to be* made, by such executor or executors that *do* or *shall* accept, or that heretofore have accepted, &c. shall be as good, &c."

The deed in question was made before the passage of this act,

but it is a beneficial statute, and, in my opinion, the deed, if not within its literal terms, is clearly within its spirit and meaning. But whether it is so or not, the statute of 21 H. 8, Ch. 4, like the statute of Wills, and other British statutes, was in force here in 1793, when the deed was made, and so continued until the 13th June, 1799 ; (*Pat. Rev.* 435.) I am therefore of opinion the deed in question was properly admitted in evidence.

Verdict set aside.

CITED in *Moore* v. *Cent. R. R. Co.*, 4 *Zab.* 277 ; *Berrien* v. *Berrien*, 3 *Gr. Ch.* 40.